**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

Dated: April 23 2007

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 05-34829 |
| | ) | |
| Chad Michael Lawson, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 05-3246 |
| | ) | |
| Juli Jones, | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Chad Michael Lawson | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on Plaintiff Juli Jones's complaint to determine dischargeability of a debt allegedly owed to her by Defendant Chad Lawson. Plaintiff alleges that the debt should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(6).

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) and the general order of reference entered in this district. Proceedings to determine dischargeability are core

proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I). This Memorandum of Decision constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Plaintiff is entitled to judgment in her favor for $25,988 on her claim under § 523(a)(2)(A) and Defendant is otherwise entitled to judgment in his favor on the complaint.

## **FINDINGS OF FACT**

Before November 2002, Plaintiff and Defendant were acquaintances. Plaintiff is an articulate, 41 year old woman with a high school education. She worked at J.C. Penney for 19 years, as a buyer in the men's department for 11 years and then in advertising for 8 years. She then worked at Home Depot doing inventory control and later became the delivery/will call coordinator.

Defendant is 31 years old and also has a high school education. His work experience includes working at a restaurant for 2 years, a car dealership for 6 years, and spending several summers working in construction. In 2001, he and his brother started a business, Lawson Brothers, which was primarily a roofing business.

In November 2002, Plaintiff hired Defendant to re-roof her house and later to do some interior work at her home. They developed a friendship and began spending time together. In early 2003, Defendant discussed leaving the roofing business and starting his own general contracting company, as he preferred doing interior work rather than exterior work such as roofing. However, Defendant owned none of the Lawson Brothers' assets, all of which were owned by his brother, and he had poor credit. Nevertheless, Plaintiff thought he was capable and had good ideas for his business. Over the course of approximately two and one-half years, loaned him approximately $187,000. The sources of these funds included advances on various credit card accounts, Plaintiff's retirement savings, as well as her daughters' inheritance from Plaintiff's step-grandmother received in early 1993 that was deposited in a bank account held jointly in the names of Plaintiff and her daughters. It is undisputed that Defendant was aware of the inheritance received by Plaintiff's daughters. The parties agreed that the money would be loaned at an 8% interest rate, which Plaintiff believed to be a sound investment of her daughters' money since she would earn an interest rate greater than what she would receive from the bank.

2

Initially, Plaintiff loaned Defendant start-up funds for his business in February and March 2003 totaling $16,000, which include an $11,000 cash advance on her VISA account. Defendant used the funds to purchase a computer, van and other tools and business items. By March and April, 2003, Defendant had started his business, Lawson General Contracting ("LGC"), hired several employees, one of which was a bookkeeper,[1] and took on some jobs consisting of kitchen remodeling and other interior work. In July 2003, Plaintiff loaned Defendant another $6,000 to cover expenses of LGC while certain construction jobs were completed.[2] Plaintiff testified that she did not expect large loan repayments from LGC initially since it was just starting up. She did, however, receive payments totaling $6,250 between May 15 and July 18, 2003. LGC was not incorporated at the time Defendant started in business and Plaintiff and Defendant never discussed the form the business should take. However, after he had obtained advice on how best to operate his business, Defendant incorporated LGC on May 23, 2003.

In June 2003, Defendant discussed with Plaintiff an opportunity that had been previously presented to him by a private investor, Tom Dicke, to build a spec home in Parklane Estates, Shawnee Township, Ohio. Plaintiff testified that she was excited about the opportunity and encouraged Defendant to undertake the project. On the recommendation of Tom Dicke, a separate company, Parklane Builders, LLC, ("Parklane Builders") was established on May 5, 2003, that would be responsible only for the building of the spec home and future spec homes in Parklane Estates. Defendant testified that the purpose of a separate company was to keep the Parklane Estates transactions separate and not confused with other jobs performed by LGC.

On June 27, 2003, Defendant entered into a written contract on behalf of Parklane Builders with Tom and Mary Alice Dicke, as trustees of a living trust, ("the Dickes") to build the Parklane Estates spec home. [Plaintiff's Ex. 12]. The contract required the Dickes to convey to Parklane Builders a parcel of real estate located at 3147 Spring Blossom Court for a purchase price of $70,000 and to extend a line of credit

---

[1] At trial, Plaintiff offered testimony that Defendant's bookkeeper during 2003 was a young woman with whom he lived and had a romantic relationship, followed later by second woman. During 2003, Plaintiff also testified that Plaintiff and Defendant developed a romantic relationship. The women were apparently unaware of his relationships with the others. In the end, however, and notwithstanding the distastefulness of Defendant's personal conduct, the court is not convinced that such conduct provides evidence in support of Plaintiff's dischargeability claims.

[2] Plaintiff's contemporaneous recording of the money loaned to Defendant states that the $6,000 represented "cash to cover Tom's bill." At trial, she initially testified that she could not remember the purpose of that loan or what bill was being "covered" but that the money was loaned to LGC. She later testified that Defendant told her the money was to be used to meet his payroll.

3

at 0% interest to Parklane Builders in an amount not to exceed $180,000 as financing for the spec home, an amount Defendant testified he initially believed would be sufficient to build the home. [*Id.* at ¶¶ 1,2, 4(a)]. The contract required Parklane Builders to execute a promissory note in the amount of $250,000 and a mortgage on the Spring Blossom Court property securing that note. [*Id.* at ¶ 9(b)]. According to the contract, advances under the line of credit would be governed by disbursement instructions attached to the agreement. [*Id.* at ¶ 4(d)]. The contract also required Parklane Builders to complete the spec home within six months of the date of closing and to pay off the promissory note on or before the earlier of the date of sale of the home or one year from the date of closing. [*Id.* at ¶ 10(a)]. In the event that the home was not completed within six months or was completed and the promissory note not paid off as contemplated, the contract gave the Dickes the option to purchase the spec home for an amount determined by specific formulas set forth in the agreement.[3] [*Id.* at ¶ 10(b) and (c)]. Before executing the contract and the documents required thereby, the Dickes' attorney, John Leahy, sent copies of the documents to Defendant for his review. Defendant did not obtain separate legal representation to review or advise him with respect to the agreement with the Dickes or the documents required by the agreement to be executed by him. On June 27, 2003, the closing of the real estate transaction took place and Defendant, on behalf of Parklane Builders, executed not only the contract with the Dickes, but also the disbursement instructions, promissory note, and mortgage securing the note. [Pl. Exs. 12, 14, 15, and 17]. In addition, Defendant executed, in his individual capacity, a guarantee of the obligations of Parklane Builders. [Pl. Ex. 16]. Accordingly, the Dickes deeded the Spring Blossom Court real estate to Parklane Builders. [Pl. Ex. 11]. LGC is not included as a party to any of the above described documents.

Soon thereafter, work on the spec home began with Parklane Builders acting as general contractor for the work, which was mostly subcontracted to others, including LGC. Defendant testified that LGC was responsible for the exterior siding and interior work, including cabinetry. However, it was not long after

---

[3] If Parklane Builders failed to complete construction of the home within six months, the contract provided the Dickes the option to purchase the premises "for the amount of the actual cost so expended by [Parklane Builders] in constructing improvements on the Property after the (sic) deducting any balance due and owing on the line of credit as extended by the Seller." [Pl. Ex. 12, ¶ 10(b)]. In the event Parklane Builders completed construction of the home within six months of the date of closing but failed to pay off the promissory note, the agreement provided the Dickes the option to purchase the property back at a price determined by the following formula: "the actual cost expended by [Parklane Builders] in constructing the residence, excluding any and all kinds of contributions of material or labor by [Parklane Builders], after deducting any balance due and owing on the line of credit extended by the [Dickes]." [*Id.*, ¶ 10(c)]. Under paragraph 10(c) of the contract, the Dickes were also required to pay ten percent of the amount actually drawn on the line of credit as a profit for Parklane Builders. [*Id.*].

4

work had begun that Defendant's business began experiencing cash flow problems. Defendant testified that, at the time he entered into the contract with the Dickes, he thought he could submit a bill to Dicke from LGC for labor in order to obtain a draw against Parklane Builders' line of credit, just as he did for any other subcontractor. However, when he attempted to do so, Tom Dicke informed him that the contract did not provide for any draws or payment for LGC labor costs and expenses and that LGC would not be paid until completion of their contract. He discussed this situation with Plaintiff and Plaintiff loaned him additional funds. On August 7, 2003, she loaned Defendant $31,000, but, in doing so, required Defendant to bring her the bills to be paid so that she could see where the money was going. She then developed a list of debts to be paid and, based on that list, loaned Defendant the money and wrote the checks for bills to be paid, which included both business and personal bills. The business invoices, which included bills from, among other places, 21st Century Kitchens, the Internal Revenue Service, and Home Depot, were billed to LGC and did not reference Parklane Builders.

Up until this time, none of the loans made to Defendant or LGC by Plaintiff were memorialized in writing. Plaintiff told Defendant that she wanted "some sort of guarantee" that she would be repaid. Defendant then drafted, without the advice or assistance of counsel, an agreement that acknowledged the debt owed to Plaintiff by Defendant at that time, the amount of the debt owed on that date being supplied by Plaintiff. The Agreement provided in its entirety as follows:

> THIS IS A LEGAL AGREEMENT BETWEEN Chad Lawson AND Julie (sic) Jones TO REPAY THE FOLLOWING DOLLAR AMOUNT BORROWED OF 47,529.41. THIS CONTRACT MAKES Julie (sic) Jones A SILENT PARTNER OF Lawson General Contracting UNTIL THE BALANCE OF THE LOAN IS PAID IN FULL. BALANCE OF LOAN TO BE PAID IN FULL AFTER OF (sic) BEFORE THE SALE OF Spec home on 3147 Springblossom Ct. ANY NEGLECT TO PAY THIS LOAN BACK IN FULL WILL RESULT IN A COMPLETE SURENDER (sic) OF ALL BUISNESS (sic) ASSETS TO Julie (sic) Jones.

[Pl. Ex. 3]. The Agreement is headed with the name and address of Lawson General Contracting, Inc. and is signed by both parties in their individual capacities. Notwithstanding the language regarding making Plaintiff a "silent partner" of LGC, Defendant testified that it was never his intent to give Plaintiff an interest in the business. Both parties testified that they did not understand the difference between a partnership and a corporation. And both parties testified regarding their understanding of Plaintiff being a "silent partner." Plaintiff testified that she understood that she would be "like a bank" and would loan money to the business but that Defendant did not want anyone to know that she was involved with the company. Similarly, Defendant testified that his understanding was that Plaintiff would loan money and he would repay with

5

interest.

Defendant's business continued to experience cash flow problems given Defendant's inability to draw on Parklane Builder's line of credit with the Dickes for LGC's labor on the spec house. He determined that his only option was to complete the spec home and find a purchaser, while continuing to obtain other jobs in order to meet payroll and other expenses. Plaintiff, in order to protect the loans she had already made, continued to loan Defendant money in order to allow him to finish the spec house so that it could be sold and she could be repaid, which the parties agree was the stated plan of repayment after construction of the spec home had begun. Thus, on December 1, 2003, Plaintiff loaned another $20,000, and on January 9, 2004, another $41,000. Defendant testified that these funds were used for payroll expenses and to pay vendors in order to continue business but that with the sale of the spec home, he and Plaintiff believed the loans could be repaid.

Following the January 9 loan from Plaintiff, Defendant executed on January 20 and March 8, 2004, two additional promissory notes in favor of the Dickes as well as mortgages on the Spring Blossom Court property securing those notes, which provided Parklane Builders additional lines of credit in the amounts of $60,000 and $6,337.05, respectively. [Pl. Exs. 19 and 20]. Notwithstanding these additional mortgages granted to the Dickes, Plaintiff continued to borrow money from Plaintiff. On January 21, 2004, he borrowed $5,000, and on February 3, 2004, he borrowed $6,000.

Plaintiff testified that she told Defendant she wanted to make her transactions with him "more legal" and that she wanted "a guarantee" from Defendant. Thus, on March 8, 2004, Defendant executed a promissory note in Plaintiff's favor ("Plaintiff's Note") for the principal sum "not to exceed" $100,000, both in his capacity as president of LGC and individually as a guarantor. [Pl. Ex. 4]. The Note was prepared by the same attorney who had prepared the notes executed by Defendant in favor of the Dickes and was executed at the attorney's office with Plaintiff present. Although, as indicated above, one of the Dicke notes was also executed by Defendant on March 8, 2004, it was not executed at the same time as Plaintiff's Note. Defendant testified that he made a separate trip to the attorney's office to execute the Dicke note.

Plaintiff's Note contains a reference to a mortgage securing the Note in a separate paragraph, stating that "[i]n case of default in payment of interest or installment. . . or, in case of default in performance of any or either of the terms and conditions of the mortgage securing this Note, the whole principal sum and accrued interest shall, at the option of the owner and holder hereof, become due and payable. . . ." [*Id.*]. Identical language is contained in paragraphs of the January 20 and March 8, 2004, Dicke notes. [*See* Pl. Ex. 19 and 20]. A separate mortgage was never executed in favor of Plaintiff. Defendant credibly testified

6

that, although the understanding between the parties was that the proceeds from the sale of the spec house would be used to satisfy Defendant's obligation to Plaintiff, there was never any discussion regarding granting Plaintiff a mortgage. Plaintiff testified that she had on two previous occasions purchased homes, had executed mortgages in connection with each purchase, and understood the purpose of a mortgage.

At some time in March or April 2004, Defendant placed the spec house on the market. On April 17, 2004, Plaintiff visited the house for the first time for the purpose of helping Defendant clean it and ready it for sale. At that time, Plaintiff testified that she saw not only a realtor's sign but also a Parklane Builders sign in the front of the house. According to Plaintiff, this was the first that she learned of the existence of Parklane Builders. However, the court does not find Plaintiff's testimony on this point credible. As early as September 13, 2003, she had received a check from Parklane Builders in the amount of $6,000 as a payment on the debt owed to her by Defendant. Although Plaintiff denies ever seeing the check, she recorded the check number in a document that she kept contemporaneously to record her loans to, and payments from, Defendant.[4] The court credits Defendant's testimony that Plaintiff knew about Parklane Builders since June 2003 when he discussed with her the business opportunity presented by Tom Dicke.

In June 2004, Defendant had not sold the Spring Blossom Court property and, on June 9 the Dickes exercised their option to repurchase the property under paragraph 10(c) of their contract with Parklane Builders.[5] The Dickes purchased the property for $340,970.76 and, at closing, Plaintiff received $20,689.70, which he, in turn, paid to 21st Century Cabinets, a supplier for the spec house. According to Plaintiff, she and Defendant anticipated from the beginning that the property would sell for "$300,000 plus."

Plaintiff admits that Defendant told her about the contract provision that permitted the Dickes to repurchase the property but testified that she did not know until sometime after June 2004 that the Dickes had exercised their option to do so. In any event, by June, Plaintiff knew that the spec house was completed. On June 2, she loaned Defendant another $10,000 which, according to Plaintiff was loaned in order to cover checks written by Defendant for which there were insufficient funds in the account. After doing so, she insisted on seeing the books for the business before she would loan Defendant any more money. In June, she instructed Defendant to terminate the employment of all his employees because he

---

[4] Although the check was not admitted into evidence, Plaintiff was shown a copy of the check at trial and she identified it as check number 1029 in the amount of $6,000 drawn on the account of Parklane. Although her contemporaneously kept records did not identify a payor, she had recorded in those records a payment from check number 1029 in the amount of $6,000.

[5] Although the Dickes' option to purchase under paragraph 10(c) of the contract did not appear to ripen until June 27, 2004, one year from the closing of the sale of the real estate on June 27, 2003, the property was transferred to the Dickes on June 9, 2004.

7

could not afford to pay them, and Defendant complied. Thereafter, Plaintiff became a signatory on LGC's checking account and was directly involved in handling the business finances. She testified that checks for both business and personal expenses, including her own personal expenses, were written from the LGC account. Plaintiff testified that she began working with Defendant at various job sites in the evening after she got off work at Home Depot. On July 4, 2004, Plaintiff loaned Defendant another $27,000 in order for him to pay taxes, including payroll taxes, that were past due.

In September 2004, both Plaintiff and Defendant sold their homes and moved together into a home being purchased by Plaintiff from her mother. The home included an unfinished space, which Defendant remodeled during the six month period that he lived there to include not only a master bedroom but also an area out of which he ran his business. However, by February 2005, their relationship had deteriorated, constantly arguing about finances. Although the parties disagree as to whether Plaintiff told Defendant to leave, he nevertheless moved out in February.

On October 20, 2004, Defendant acknowledged amounts loaned to him by Plaintiff by signing a document prepared by Plaintiff listing the loan amounts. [Pl. Ex. 6]. In addition to the loans already set forth in this opinion, the document indicates that Defendant owes Plaintiff $566 for "Tax," $2,700 for "HD Stock," and $21,200 for charges on her VISA, Discover and Home Depot accounts. There is no testimony or other evidence as to when or for what purpose these particular loans were made. Defendant does not, however, dispute that Plaintiff loaned him these funds.

On May 12, 2005, Defendant filed the underlying Chapter 7 petition. And on August 9, 2005, Plaintiff timely filed the instant complaint to determine the dischargeability of the debt owed to her by Defendant. Plaintiff alleges that the debt owed to her, after deducting payments by Defendant of $22,000, totals $165,000.

## LAW AND ANALYSIS

Plaintiff seeks a determination that the debt owed to her by Defendant is nondischargeable under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B) and (a)(6). A creditor must prove exceptions to dischargeability for individual debts under § 523(a), including the exception for fraud, by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991). Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998).

8

**I. 11 U.S.C. § 523(a)(2)(A)**

Section 523(a)(2)(A) excepts from discharge a debt " for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ." In order to except a debt from discharge under this section due to false pretense or false representation, a plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor obtained money or services through a material misrepresentation, either express or implied, that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998). A debtor's intent to defraud a creditor is measured by a subjective standard and must be ascertained by the totality of the circumstances of the case at hand. *Id.* at 281-82. "If there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *ITT Fin'l Servs. v. Szczepanski (In re Szczepanski),* 139 B.R. 842, 844 (Bankr. N.D. Ohio 1991).

For purposes of § 523(a)(2)(A), "false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983). "'False pretense' involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a 'false representation' which is an express misrepresentation." *Ozburn v. Moore (In re Moore)*, 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002)(quoting *Sears Roebuck & Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 750 (Bankr. N.D. Ind. 1986)).

In addition, § 523(a)(2)(A) also addresses "actual fraud" as a concept broader than misrepresentation. *See McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000); *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873 (B.A.P. 6th Cir. 2001). "Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud." *Vitanovich*, 259 B.R. at 877 (quoting *Gerad v.Cole (In re Cole)*, 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993)). A debtor's intent to defraud a creditor under § 523(a)(2)(A) is measured by a subjective standard and must be ascertained by the totality of the circumstances of the case at hand. *Id.*; *Rembert*, 141 F.3d at 281-82. A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's "course of conduct," as direct proof of intent will rarely be available. *Hamo v. Wilson (In re Hamo),* 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999).

9

Plaintiff first contends that Defendant obtained the loaned funds from her under the false pretense or by misrepresenting that LGC owned the spec house and that she had an interest in LGC. With respect to Plaintiff's purported interest as a "silent partner" in LGC, the court finds no intentional misrepresentation. Rather, the Agreement prepared by Defendant without the advice or assistance of legal counsel simply demonstrates the parties' acknowledged mutual lack of understanding regarding the legal significance of the words used in their Agreement. The Agreement itself was obviously insufficient to create an interest of Plaintiff in the business, except perhaps as its creditor with a lien on the business assets, as LGC is a corporation. And there is no evidence indicating that Defendant concealed the fact that LGC was incorporated, as the heading on the agreement clearly set forth that fact. The parties' consistent testimony regarding their understanding of the meaning of "silent partner" was that Plaintiff would act "like a bank" and Defendant would repay her with interest. The court is not convinced that any intentional misrepresentation occurred with respect to Plaintiff's interest in LGC.

The court also finds no intentional misrepresentation, either implied or express, with respect to ownership of the spec house. There is no testimony that Defendant ever expressly represented to Plaintiff that LGC owned the spec house. And the court does not find that Defendant impliedly represented that LGC owned the spec house by failing to disclose the existence and purpose of Parklane Builders. As discussed above, the court does not credit Plaintiff's testimony that she was unaware of the existence of Parklane Builders until April 2004. At the very least, the fact that Defendant used a check drawn on the account of Parklane Builders to make a payment to Plaintiff as early as September 2003, demonstrates a lack of any fraudulent intent on Defendant's part to hide the existence of Parklane Builders from her. Similarly, there is no evidence that Defendant attempted to conceal the Parklane Builders' sign in front of the spec house when Plaintiff first visited the property in April 2004. The court does not believe that Defendant organized Parklane Builders in order to effect any scheme to defraud Plaintiff. Rather, the company was organized at the insistence of Tom Dicke, who apparently is a more astute businessman than Defendant, to keep the funds loaned by the Dicke trust for completion of the spec house separate from other jobs performed by LGC. There being no intent to deceive Plaintiff by creating Parklane Builders, there was no reason for Defendant to conceal its existence and purpose when he initially discussed with Plaintiff the opportunity presented to him by Dicke.

Plaintiff also contends that Defendant misrepresented to her that he would grant her a mortgage in the Spring Blossom Court property. However, the court credits Defendant's testimony that the parties never discussed him granting Plaintiff a mortgage, and Plaintiff did not testify otherwise. She testified that she

10

told Defendant she wanted something "more legal" than their initial Agreement and that she wanted a "guarantee." To the extent that Plaintiff relies on language in the March 2004 Note executed in her favor by Defendant that references a mortgage as an intentional misrepresentation by Defendant, the court is not so persuaded. Plaintiff's Note was not prepared by Defendant but by the same attorney who had prepared another note executed on the same date in favor of the Dickes, which note contained identical language and was secured by a mortgage. The court finds it more likely than not that the reference to a mortgage in Plaintiff's Note was an inadvertent attorney error. Plaintiff testified that she had previously signed two mortgages for homes and that she understood what a mortgage is. The court further finds that Plaintiff could not have justifiably relied on language in a promissory note simply referring to a mortgage in loaning any additional funds to Defendant when Defendant never actually executed a mortgage in Plaintiff's favor.

Plaintiff also argues that Defendant misrepresented that the loaned funds would be used for LGC rather than for his own personal use and the use of Parklane Builders. Again, the court finds no intentional misrepresentation as to the use of the funds. Plaintiff was well aware of the fact that at least some of the funds were used for personal expenses, as she actually wrote the checks for payment of those expenses. Although Plaintiff testified that Defendant purchased a home in July 2003 and a truck in December 2003, purchases that she became aware of shortly after they were made, there is no evidence as to how Defendant paid for or financed these purchases. The court cannot conclude, without some such evidence, that Defendant used Plaintiff's loaned money to make the purchases. Moreover, after learning of these purchases, Plaintiff continued to loan Defendant substantial sums of money. This fact supports a finding that even Plaintiff did not believe that Defendant was misusing the loaned funds. And for the reasons already discussed, the court finds no intentional misrepresentation based on Parklane Builders' use of the loaned funds. Rather, the court believes that Plaintiff understood that the funds were loaned primarily, but not exclusively, in order to complete the spec house and that Parklane Builders was involved in that endeavor.

Finally, the court considers Plaintiff's testimony that she had no knowledge of the mortgages on the Spring Blossom Court property that were granted by Parklane Builders on behalf of the Dickes. Defendant, as a member of Parklane Builders, granted three mortgages totaling $316,337 in favor of the Dickes on property that the parties anticipated selling for only "$300,000 plus." Defendant's repeated assurances that he would repay Plaintiff's loans with proceeds from the sale of the spec house would support a finding of an intentional misrepresentation if he did not, in fact, believe there would be sufficient proceeds to meet his repayment obligation at the time he made those representations. *See Stifter v. Orsine (In re Orsine)*, 254

11

B.R. 184, 188 (Bankr. N.D. Ohio 2000) (explaining that "any debtor who does not intend to perform a contract from its inception has knowingly made a false representation"). Section 523(a)(2)(A), however, excepts from discharge only a debt for money *to the extent obtained b*y false pretenses, false representation or actual fraud. *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215,219-20 (4th Cir. 2007) (explaining that "Congress excepted from discharge not simply any debt incurred as a result of fraud but only debts in which the debtor used fraudulent means to obtain money, property services or credit"). Thus, the court must consider separately each loan and Defendant's representation and intent at the time the loan money was obtained by him.

Defendant obtained the first three loans from Plaintiff in the amount of $16,000 in February and March 2003. At this time, the spec house opportunity had not yet been raised and, thus, no representation regarding Defendant's repayment from the sale proceeds of the house had been made. As such, these loaned funds were not obtained by a false representation regarding the source of their repayment.

In June 2003, Defendant entered into his agreement with the Dickes and executed a mortgage in the amount of $250,000 which secured notes in the amount of $70,000 for purchase of the real estate and a $150,000 line of credit to be used to build the spec house. By July 2003, Defendant had begun work on the spec house and had learned that he could not take advances from the line of credit provided by Dicke for LGC's labor costs. Thus, Defendant began borrowing money from Plaintiff at this time, assuring her that she would be repaid from the proceeds of the sale of the spec house. Between July 2003 and January 9, 2004, Defendant borrowed an additional $98,000. Although Plaintiff testified that she did not know about the $250,000 mortgage, Plaintiff clearly was aware of the Dickes' involvement in providing the land and the financing for construction of the spec house. Understanding the concept of a mortgage, Plaintiff had no reason to believe that the Dickes would not secure reimbursement of their investment at the time of the sale of the spec house.

By January 9, 2004, Defendant had borrowed a total of $114,000 and had repaid at least $13,750, leaving an approximate balance owed to Plaintiff of $100,250. According to Plaintiff, Defendant anticipated selling the house for "$300,000 plus." Defendant testified that he estimated the cost to complete the spec house would be $250,000, which is consistent with the original transactions with the Dickes. On this evidence, the court cannot conclude that granting the Dickes a $250,000 mortgage, even if Plaintiff did not understand that Defendant had granted the mortgage, demonstrates that Defendant did not intend to use the proceeds of the sale of the spec house to repay Plaintiff. The Dicke mortgage, plus the amount owed to Plaintiff, falls within the anticipated amount of the sale of the house. The court finds that Defendant

12

actually intended to repay these loans out of the sale proceeds. Thus, the court concludes that Plaintiff has failed to prove that the $98,000 in loan moneys were obtained by Defendant by falsely representing that the money would be repaid from the spec house sale proceeds.

However, on January 20, 2004, Defendant obtained an additional line of credit of $60,000 from the Dickes and granted them a mortgage in that amount. The court credits Plaintiff's testimony that she was unaware of this mortgage. At that time, Defendant had granted the Dickes mortgages totaling $310,000 and still owed Plaintiff $100,250, for a total of $410,250, an amount significantly more than that for which the parties anticipated selling the spec house and for which the house was ultimately sold to the Dickes. Nonetheless, Defendant borrowed from Plaintiff another $5,000 on January 21, 2004, and $6,000 on February 3, 2004. On March 8, 2004, Defendant executed another mortgage in the amount of $6,337 in favor of the Dickes, even further impairing his ability to repay from the sale proceeds of the spec house the amount owed to Plaintiff. Although executed on the same day that he executed a promissory note in favor of Plaintiff, the fact that he did not execute the documents on the same visit to attorney Leahy's office but, instead, made two separate visits supports the court's finding that this mortgage was also intentionally concealed from Plaintiff. Defendant's testimony that, by this time, he still intended to repay her from the sale proceeds is not credible. In fact, he continued to borrow money from Plaintiff notwithstanding his now obvious inability to repay her through the sale of the spec house. During May 2004, he borrowed a total of $4,998 and on June 2, 2004, another $10,000. Thus, between January 21 and June 2, 2004, Defendant borrowed a total of $25,998 from Plaintiff, resulting in amount owed to her plus the amount necessary to pay off the Dicke mortgages that totaled well beyond the amount for which he ever anticipated actually selling the spec house. The court finds that Defendant obtained the $25,998 loaned by Plaintiff between January 21 and June 2, 2004, by intentionally misrepresenting to her, either expressly or impliedly through their course of dealings, that he would repay these loans with proceeds from the sale of the spec house. The court credits Plaintiff's testimony that had she known of these additional mortgages, she would not have continued to loan these funds to Defendant and finds her reliance on Defendant's representations to be justified given her understanding of the value of the project.

Finally, the court considers the final $27,000 Plaintiff loaned to Defendant on July 4, 2004. The court previously determined that, by this date, Plaintiff knew that the spec house was completed and that the Dickes had repurchased the spec house. The court does not believe that, at the time this loan was made, Plaintiff still believed she would be repaid from the proceeds of that sale. Rather, she testified that she loaned him the money in order to pay taxes that were past due and that she believed he could otherwise have

13

gone to jail. It is clear that the parties worked together, at least for several more months, attempting to make LGC a profitable business, presumably so that Plaintiff could be repaid. The court is not persuaded that this $27,000 was obtained by Defendant by any misrepresentation.

Accordingly, the court finds that $25,988 of the total amount loaned by Plaintiff to Defendant is nondischargeable under § 523(a)(2)(A).

## II. 11 U.S.C. § 523(a)(2)(B)

Section 523(a)(2)(B) provides as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –
. . . .
    (2) for money . . . to the extent obtained by –
. . . .
        (B) use of a statement in writing–
            (i) that is materially false;
            (ii) respecting the debtor's or an insider's financial condition;
            (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
            (iv) that the debtor caused to be made or published with intent to deceive.

Although Plaintiff did not specifically argue this claim at trial, in her complaint, the written statements she relies on are the parties' Agreement stating that Plaintiff is a "silent partner" in LGC and the March 8, 2004, Note executed in Plaintiff's favor by Defendant, both individually and as president of LGC, that makes reference to a mortgage. Plaintiff alleges that these written statements constitute statements regarding her ownership interests in LGC and mortgage interests in the Spring Blossom Court property that are materially false and were made by Defendant with the intent to deceive her.

As the court explained in ruling on Plaintiff's motion for summary judgment,

> while these documents are in writing, they are not "statement[s]...respecting the debtor's or an insider's financial condition." They are both promises for and the terms of repayment of certain debts and do not mention Debtor's financial condition. As transactional documents they say nothing about Debtor's financial responsibility, creditworthiness and ability to repay the debts memorialized by them. *Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 709-10 (Bankr. N.D. Ill. 2004)(bad check and settlement agreement not statements respecting debtor's financial condition); *Caruso v. Segal (In re Segal)*, 195 B.R. 325, 331-32 ((Bankr. E.D. Pa. 1996)(lease and promissory note are not statements respecting debtor's financial condition). Any inferences that might be drawn about Debtor's financial condition and his ownership of property from these documents are not enough to bring them under § 523(a)(2)(B).

[Doc. # 38, p. 10]. Moreover, as discussed above, Defendant did not intend that the "silent partner"

14

language in the Agreement convey Plaintiff an interest in LGC and the reference to a mortgage in the Note was more than likely an attorney error rather than an intentionally deceptive statement by Defendant. Plaintiff has thus failed to establish that she is entitled to judgment on her § 523(a)(2)(B) claim.

### III.  11 U.S.C. § 523(a)(6)

Section 523(a)(6) provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable.  11 U.S.C. § 523(a)(6).  In order to be entitled to a judgment that the debt is excepted from discharge, Plaintiff must prove by a preponderance of the evidence that the injury from which the debt arises was both willful and malicious.  *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999); *J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 801-2 (Bankr. N.D. Ohio 2001).  A willful injury occurs when "(i) the actor desired to cause the consequences of the act or (ii) the actor believed that the given consequences of his act were substantially certain to result from the act." *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 307 (B.A.P. 6th Cir. 2004) (citing *Markowitz*, 190 F.3d at 464).  Under § 523(a)(6), "'malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *Id.* (citing *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986).

Again, Plaintiff did not specifically argue this claim at trial.  Although Defendant knew his fraudulent misrepresentation that he would repay these loans from proceeds of the sale of the spec house was substantially certain to result in Plaintiff loaning the funds and not being repaid as promised, the court does not find that Defendant maliciously caused Plaintiff's injuries. As already indicated Defendant's unacceptable and ultimately undisputed personal conduct in sleeping with multiple women at the same time does not in the court's view prove malicious conduct toward Plaintiff so much as a more generalized moral shortcoming not ultimately probative of Plaintiff's specific claims.  Plaintiff testified at the conclusion of her direct examination that Defendant told her as their relationship ended that "what the hell the would I be doing with a 40 year old woman but for the money." If this statement was made, it was essentially on the way out the door in a spasm of then obvious mutual bitterness intended to wound.  From the court's observations of the demeanor and emotions shown by both parties in trial, they both really cared for each other at least in the beginning of their inextricably intertwined business and personal relationships. The court does not find such a statement sufficient given the overall circumstances of the commencement, development and finally the conclusion of their relationships to retroject proof by a preponderance of the evidence of essentially a reprehensible two year lie by Defendant.

15

**IV. Attorney Fees and Interest**

Plaintiff also argues that she is entitled to an award of attorney's fees as an element of her compensatory damages for Defendant's fraudulent misrepresentation. Generally, under the "American Rule," which applies to litigation in the bankruptcy courts, a prevailing litigant may not collect attorney's fees from her opponent unless authorized by federal statute or an enforceable contract between the parties. *In re Sheridan*, 105 F.3d 1164, 1166 (7th Cir. 1997). There must therefore be a statute, a contract or other specific rule of common law authorizing an award of attorney's fees. *See Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*,–U.S.–, 127 S. Ct. 1199, 1203-04 ( 2007). The court does not find any legal or factual basis for an award of attorney's fees to Plaintiff.

There is no basis in the Bankruptcy Code for an award of attorney's fees to a creditor successfully prosecuting a § 523(a)(2)(A) claim *See id.; cf.* 11 U.S.C. § 523(d)(debtors shall be awarded attorney's fees in certain circumstances not present here). Nothing in § 523(a)(2)(A) indicates that Congress intended the prevailing party to be awarded fees.

Even though the basis for recovery is fraud, there is nothing in the parties' written agreements that would arguably provide plaintiff with a contractual basis for an award of attorney's fees. [*See* Plaintiff's Exs. 3 and 4].

Under Ohio law, plaintiffs who successfully prove fraud are entitled to an award of attorney's fees under certain circumstances. But this entitlement is not automatic. Contrary to the holding in the unreported Ohio appellate court case cited by Plaintiff, *see Zappitelli v. Miller*, 2006 WL 178558 (Ohio App. Jan. 26, 2006), *discretionary appeal granted* 110 Ohio St. 3d 186 (Table) (Aug. 2, 2006),[6] the Ohio Supreme Court has clearly stated that attorney's fees are only appropriately awarded on a fraud claim where punitive damages are warranted. *Galmish v. Cicchini*, 90 Ohio St. 3d 22, 35 (2000) (agreeing that the appropriateness of awarding attorney fees is dependent upon the propriety of the award for punitive damages and finding that "[a]ttorney fees may be awarded as an element of compensatory damages where the jury finds that punitive damages are warranted."). The record must support a finding that the legal standard for punitive damages could have been met, whether they are sought or not. In turn, that standard requires a finding that the fraud has been gross or malicious. *Logsdon v. Graham Ford Co.*, 54 Ohio St. 2d 336, 339-40 (1978); *Bennice v. Bennice*, 82 Ohio App. 3d 594, 599 (Ottawa Cty. 1992). Plaintiff has not sought

---

[6]The proposition of law upon which the discretionary appeal was allowed in *Zappitelli* addresses the issue at hand. The case was argued in the Ohio Supreme Court on March 13, 2007. No decision has been rendered as of the entry of this opinion.

16

punitive damages and the court finds that the evidence does not establish the sort of malice on Defendant's part necessary to justify an award of punitive damages beyond his basic liability for fraudulent misrepresentation.

Finally, Plaintiff argues that she is entitled to interest on the nondischargeable loans as part of her compensatory damages. While Plaintiff is entitled to post-judgment interest on any money judgment in this case, *see* 28 U.S.C. § 1961, as support for an award of prejudgment interest, she cites only the reasoning set forth in *Cohen v. De La Cruz,* 523 U.S. 213 (1998). In *Cohen*, the plaintiffs had obtained a judgment against the debtor in state court before the bankruptcy case commenced. The judgment included an award of punitive damages, as well as treble damages, attorney's fees and costs under the New Jersey Consumer Fraud Act. The Supreme Court rejected the debtor/petitioner's argument that the treble damages, attorney's fees and costs portion of the state court judgment were dischargeable because they did not reflect money, property or services "obtained" by the debtor through the fraud.

Notwithstanding some of the broad language in *Cohen*, particularly the language evincing the Court's belief that Congress did not intend the language of the statute to impose a "restitutionary limit" on nondischargebalility under § 523(a)(2)(A), *see Cohen*, 523 U.S. at 214, this court nevertheless believes that, after *Cohen*, bankruptcy courts in § 523(a)(2)(A) cases must still distinguish between creditor losses occasioned by fraud and creditor losses occasioned only by dischargeable breach of contract. None of the examples cited by the Supreme Court in support of its concern and reasoning that the petitioner's argument would result in unfairly discharging losses exceeding the value received by a debtor are remotely similar to this case. To the extent Plaintiff's basis for an award of prejudgment interest is Defendant's agreement to pay her 8% interest on the amounts loaned, such interest represents Plaintiff's contract damages and not compensatory damages for fraud. Plaintiff cannot argue both that she would not have entered into the agreement in the first place and that she is entitled to the benefit of the bargain. As the theory of the case is that Plaintiff never would have loaned the $25,988 if she had known the truth, Plaintiff's damages proximately caused by Defendant's fraud include an amount based on what she was earning on the money, if any, when it was loaned to him. However, there is no evidence in the record supporting such an amount other than that it was less than 8%. The court cannot speculate on what such an amount would be.

The only other arguable basis for an award of prejudgment interest of which this court is aware is Ohio Rev. Code § 1343.03(C). This statute governs prejudgment interest in civil actions based on tortious conduct and not settled by agreement of the parties. Proper procedure under the statute requires the party claiming entitlement to prejudgment interest to file a post-decision motion, and then a hearing must be held.

17

The only basis upon which prejudgment interest may then be awarded under § 1343.03(C) is proof of a party's failure to make a good faith effort to settle the case. The court cannot make such a determination in this case from the existing trial record. If Plaintiff believes she has a basis upon which to properly request an award of prejudgment interest under § 1343.03(C), then she will have to establish such on the record after a request is made as set forth above.

## CONCLUSION

In light of the foregoing, the court finds that Plaintiff is entitled to judgment on her claim brought under 11 U.S.C. § 523(a)(2)(A) in the amount of $25,988 and that such debt is nondischargeable under those provisions of the Bankrupcty Code. Defendant is entitled to judgment on Plaintiff's claims brought under 11 U.S.C. § 523(a)(2)(B) and (a)(6). A separate judgment in accordance with this Memorandum of Decision will be entered by the court.